## Case No. 13-7606

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

ADIB EDDIE RAMEZ MAKDESSI

*Plaintiff-Appellant,*

v.

LT. FIELDS, ET AL.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

# OPENING BRIEF FOR PLAINTIFF-APPELLANT ADIB EDDIE RAMEZ MAKDESSI

Daniel Suleiman
Stephen Kiehl
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (202) 662-6000
Facsimile: (202) 778-5872
dsuleiman@cov.com
skiehl@cov.com

*Counsel for Plaintiff-Appellant*
*Adib Eddie Ramez Makdessi*

June 9, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, the Plaintiff-Appellant states that, as an individual, he has no parent corporation or publicly held corporation that owns 10 percent of more of stock, and that he is not aware of any publicly held corporation that has a direct financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ............................................................ 1

ISSUE PRESENTED ............................................................................. 1

STATEMENT OF THE CASE ................................................................. 2

STATEMENT OF FACTS ...................................................................... 5

      A.    Mr. Makdessi Was Assigned to a Cell with a Much
           Stronger, Younger Inmate with a History of Prison
           Violence, Despite Telling Guards He Feared for His
           Life .................................................................................. 5

      B.    Mr. Makdessi Filed Numerous Grievances and
           Complaints in the Year Leading Up to the Assault and
           Rape ................................................................................ 9

      C.    The Assault on December 21, 2010 ...................................... 17

      D.    Department of Corrections Policy Requires Supervisors
           to Be Made Aware of Allegations of Sexual Assault ........... 22

SUMMARY OF ARGUMENT .................................................................. 25

STANDARD OF REVIEW ...................................................................... 28

ARGUMENT ........................................................................................ 29

I.    The Prison Officials Had Knowledge of the Substantial Risk
    of Serious Harm to Mr. Makdessi's Health and Safety ................. 31

II.   The Defendant Officials' Failure to Respond Adequately to
    the Risk Shows a Disregard that Constitutes Deliberate
    Indifference .................................................................................. 38

CONCLUSION ..................................................................................... 40

STATEMENT WITH RESPECT TO ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ATTACHMENT A

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brice v. Virginia Beach Corr. Ctr.,*
    58 F.3d 101 (4th Cir. 1995)......................................................28

*Brown v. N.C. Dep't of Corr.,*
    612 F.3d 720 (4th Cir. 2010)..............................................28, 32

*Farmer v. Brennan,*
    511 U.S. 825 (1994)........................................................... passim

*Haley v. Gross,*
    86 F.3d 630 (7th Cir. 1996)...............................................33, 34

*Helton v. AT & T Inc.,*
    709 F.3d 343 (4th Cir. 2013)...................................................28

*Hicks v. Norwood,*
    640 F.3d 839 (8th Cir. 2011)...................................................29

*Hope v. Pelzer,*
    536 U.S. 730 (2002).................................................................35

*Iko v. Shreve,*
    535 F.3d 225 (4th Cir. 2008)...................................................39

*Odom v. S.C. Dep't of Corr.,*
    349 F.3d 765 (4th Cir. 2003)............................................. passim

*Parrish v. Cleveland,*
    372 F.3d 294 (4th Cir. 2004).......................................32, 38, 41

*Rich v. Bruce,*
    129 F.3d 336.............................................................................37

*Rish v. Johnson,*
    131 F.3d 1092 (4th Cir. 1997)................................................32

*Rodriguez v. Sec. for Dep't of Corr.*,
    508 F.3d 611 (11th Cir. 2007) ........................................................... 39

*Shakka v. Smith*,
    71 F.3d 162 (4th Cir. 1995) ............................................................... 37

*Spruce v. Sargent*,
    149 F.3d 783 (8th Cir. 1998) ....................................................... 33, 34

## CONSTITUTION, STATUTES AND RULE

U.S. Constitution, amend. VIII ..................................................... passim

28 U.S.C. § 636(b)(1) ......................................................................... 29

28 U.S.C. § 636(b)(1)(B) ...................................................................... 1

28 U.S.C. § 1291 .................................................................................... 1

28 U.S.C. § 1331 .................................................................................... 1

42 U.S.C. § 1983 .................................................................................... 3

Prison Rape Elimination Act of 2003, Pub. L. No. 108-79,
    117 Stat. 972 (codified at  42 U.S.C. § 15601 *et seq*) ......................... 22

42 U.S.C. § 1983 .................................................................................... 3

Fed. R. App. P. 28(f) ..................................................................... 6, 23

## OTHER AUTHORITIES

Virginia Department of Corrections
    Operating Procedure 038.3,
    *Sexually Abusive Behavior
    Prevention and Intervention*, § IV ...................................5-6, 22-23, 36

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. The district court referred the case to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B), and the magistrate judge issued her Report and Recommendation on May 3, 2013. J.A. 955-77. On September 24, 2013, the district court issued a Memorandum Opinion adopting in full the magistrate judge's Report and Recommendation. J.A. 996. Adib Eddie Ramez Makdessi filed a timely notice of appeal from that Memorandum Opinion on September 30, 2013. J.A. 1011. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether the district court clearly erred in adopting the magistrate judge's Report and Recommendation finding that the defendants lacked knowledge of the risk of harm posed by the plaintiff-appellant's cellmate, in light of the totality of the evidence, including numerous grievances and complaints of physical and sexual abuse filed by the plaintiff-appellant and the inaction of prison officers in the face of a sustained attack on the plaintiff-appellant.

## STATEMENT OF THE CASE

Twenty years ago, the Supreme Court declared that "gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency," and that being violently assaulted in prison is "simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations and internal quotation marks omitted). But many inmates — Adib Eddie Ramez Makdessi among them — continue to pay that price through violent assaults and rapes in America's prisons.

On December 21, 2010, Mr. Makdessi was physically and sexually assaulted for more than two hours by his cellmate, Michael Smith, at Wallens Ridge State Prison ("WRSP" or "Wallens Ridge") in Big Stone Gap, Virginia.[1] The attack ended only when the cell door was opened and Mr. Makdessi was able to run into the prison "pod," followed

---

[1] The magistrate judge found that Mr. Makdessi "clearly suffered serious physical injuries resulting from the assaults that occurred on December 21, 2010." J.A. 964. While noting that the rape kit test found blood in the anorectal sample and on the inside back of Mr. Makdessi's underpants, J.A. 961, the magistrate did not make a finding as to sexual assault. The district court adopted the magistrate's facts. J.A. 996.

closely by his cellmate, who caught up to him and continued beating him until a prison guard fired a blank round to stop the attack. On June 7, 2011, Mr. Makdessi filed a complaint under 42 U.S.C. § 1983, alleging a violation of his Eighth Amendment right to be free of cruel and unusual punishment. J.A. 17-18. The complaint named as defendants the Virginia Department of Corrections Director Harold W. Clarke; prison guards Lt. Fields, Sgt. King, Capt. Gallihar, and "Sutner," later determined to be Timothy Sumpter; and several John and Jane Doe prison officials. J.A. 21. An amended complaint identified additional defendants David Bellamy, Glen Boyd, Thomas Hall, Brandon Woodard, Clarence Shupe and Dennis Sluss. J.A. 67.

The defendants filed a motion for summary judgment arguing that the plaintiff had not exhausted his administrative remedies. J.A. 203. The district court denied the motion, finding that the defendants could not show inexhaustion. J.A. 84-85. The defendants filed a second motion for summary judgment, arguing that the plaintiff could not show the defendants were deliberately indifferent to the risk of harm from his cellmate, and that they were entitled to qualified immunity to the extent they were being sued in their official capacities for

monetary damages. J.A. 92-108. The district court granted the motion for qualified immunity to the extent the defendants were being sued in their official capacities. J.A. 225. On the Eighth Amendment deliberate indifference claim, the court granted the motion as to defendants Clarke, Woodard, Shupe and Sluss, and denied the motion as to defendants Fields, King, Gallihar, Sumpter, Bellamy, Boyd and Hall. J.A. 232-33. The district court referred the case to a magistrate judge. J.A. 234-A. The magistrate judge granted plaintiff's motion to voluntarily dismiss defendant Sumpter. J.A. 241.

After conducting a two-day evidentiary hearing, the magistrate judge issued a Report and Recommendation finding that "the defendants did not fail to protect Makdessi on December 21, 2010, either from the assault in his cell or from the assault that occurred in the pod after he ran from his cell," and recommended judgment in favor of the defendants. J.A. 956. The plaintiff filed a timely objection to the Report and Recommendation. J.A. 978. The district court adopted the Report and Recommendation in its entirety. J.A. 996.

This appeal followed.

4

## STATEMENT OF FACTS

**A.    Mr. Makdessi Was Assigned to a Cell with a Much Stronger, Younger Inmate with a History of Prison Violence, Despite Telling Guards He Feared for His Life**

Mr. Makdessi was assigned to Wallens Ridge in January 2007. J.A. 505. Mr. Makdessi is 5-foot-4, J.A. 1007, and was 49 years old at the time of the evidentiary hearing in this case, J.A. 503. Mr. Makdessi was hit by a bus in 1992, requiring back surgery, and continues to suffer from back pain and asthma. J.A. 504. Because of his size and lack of gang affiliations, he has had problems defending himself in prison and has had to pay for protection. J.A. 505-06.

Virginia Department of Corrections policy states that inmates with a "potential for victimization" or those who are older or who have special medical issues or disabilities should be assessed for whether they would be at risk in a shared cell assignment. Virginia Department of Corrections Operating Procedure 038.3, *Sexually Abusive Behavior Prevention and Intervention*, § IV(B)(3)(b)(i).[2]   The policy also

---

[2] A copy of the policy can be found at Attachment A, pursuant to Fed. R. App. P. 28(f).

states that assignments to double cells "shall consider the compatibility of both cell mates," and that offenders identified as being "at risk for sexual victimization" shall be identified and assessed. *Id.* § IV(B)(3)(b)(iii)-(iv). Further, the policy states that offenders "exhibiting sexually aggressive behavior" should be screened to determine if special housing assignment is necessary for them. *Id.* § IV(B)(3)(b)(ii).

Despite these policies, Mr. Makdessi was repeatedly housed with aggressive cellmates who assaulted him. In his first year at the prison, his cellmate assaulted him, and Mr. Makdessi filed a grievance saying, "I fear for my life." J.A. 245, 507-08. The cellmate punched Mr. Makdessi in the ribs, threatened him with a razor blade, and told Mr. Makdessi to leave the cell or he would kill Mr. Makdessi. J.A. 246. When Mr. Makdessi reported this to prison officers, they placed him in segregation for 35 days. J.A. 508-09. In an Inmate Request for Information to the Assistant Warden, he said the officers told him "this is what [you] get" for snitching. J.A. 246. In response to that request, the staff stated that Mr. Makdessi's concerns would be forwarded to the "appropriate staff," and Capt. Gallihar (who was then a lieutenant) was copied on the response. *Id.*

6

Mr. Makdessi's next cellmate, Jared Swartzmiller, had shared a cell with Mr. Makdessi once before, at the Virginia Beach jail, where Swartzmiller assaulted Mr. Makdessi to such an extent that Mr. Makdessi filed civil assault and battery charges against him. J.A. 247, 512. Even though Swartzmiller was then placed on Mr. Makdessi's "enemy list" — a list maintained by the Department of Corrections of inmates who should not be housed together because there has been a verified prior assault by one upon the other — and even though Mr. Makdessi told Wallens Ridge officers about this, they were still paired together at Wallens Ridge. J.A. 512-13. Mr. Makdessi testified that Swartzmiller assaulted him during the more than two years they were housed together. *Id.*

In early August 2010, several months before the assault at issue here, Mr. Makdessi was moved to a cell with Michael Smith, who was younger and stronger than him, and who had an extensive history of prison infractions and violations. J.A. 287. Smith, a member of the "Gangster Disciples," had received almost 30 infractions from prison officials at Wallens Ridge, including for fighting with other inmates, possession of contraband, possession of gang paraphernalia, possession of a

7

weapon (razor blade), attempting to incite a riot, assaulting a correctional officer on at least two separate occasions, masturbating in the prison shower, threatening bodily harm on a correctional officer, and making sexual advances on a non-offender (pressing his penis against a female prison staffer in the dish room). J.A. 426, 429, 433, 438, 446, 451-53, 458, 463, 466-67, 475, 479, 483-86.

The first day that Mr. Makdessi was assigned to a cell with Smith, Mr. Makdessi immediately walked out of the cell, went to the floor correctional officer and told him he wanted to be in a different cell because he was afraid of being attacked. J.A. 287, 541. Mr. Makdessi described the response in a letter to an investigator: "I told him I fear for my life, he said I will tell Sergeant King[,] who was on duty. Sergeant King said to[o] bad stop being a bitch & he told my rap[i]st that I am trying to check into P/C and to teach me a lesson." J.A. 287. The officials did not separate Mr. Makdessi and Smith, and instead they left a vulnerable inmate in the same cell with an offender who had a long history of prison violence.

On or around December 8, 2010, two weeks before the assault at issue in this case, Mr. Makdessi was physically and sexually

8

assaulted by his cellmate.  J.A. 276, 565-66.  Mr. Makdessi testified that as he was returning from dinner, members of his cellmate's gang came up behind him and stabbed him in the back with a shank, for being a "snitch."  J.A. 563-65.  He did not see who attacked him, but when he got back to his cell, his cellmate, Smith, "started beating me up, and he said that his gangs know that I'm a snitch, that I need to be taught a lesson."  J.A. 565.  Smith also raped him, Mr. Makdessi testified.  J.A. 566.  The next day, he told Sgt. King of the sexual assault, but Sgt. King told him, "Get back to your table."  *Id.*  Prison officials did not investigate the alleged assault.  J.A. 566-67.

### B. Mr. Makdessi Filed Numerous Grievances and Complaints in the Year Leading Up to the Assault and Rape

For one year prior to the December 21, 2010 assault and rape, Mr. Makdessi attempted in every way he knew how to alert the staff at Wallens Ridge to the fact that he was being physically and sexually assaulted and that his life was at risk.  The trial court record contains extensive evidence of verbal complaints, written grievances and complaints, and letters sent by Mr. Makdessi to a host of individuals at the FBI, the Virginia Department of Corrections, and Wallens Ridge de-

tailing the physical and sexual abuse he was suffering.

On December 20, 2009, Mr. Makdessi submitted a complaint form to the WRSP Medical Office stating that he had been sexually assaulted "4 times in the past 3 years that I have been in WRSP." J.A. 248. Qualified Mental Health Professional ("QMHP") Clark responded on January 5, 2010: "If you have any issues that are related to psychology — please let us know and we will do whatever we can to help you. Hopefully you will be well soon." *Id.*

On March 10, 2010, Mr. Makdessi wrote to a prison official named A.P. Harvey, stating that Sgt. King had kicked his laundry out of his cell, yelled at him, and said he didn't want to hear from Mr. Makdessi. J.A. 251. Mr. Makdessi wrote that none of the other correctional officers would speak with him that day. *Id.*

On May 3, 2010, Mr. Makdessi submitted an Inmate Request for Information to the prison Operations Officer saying that the correctional officers stand at his door and yell at him, that he had been sexually assaulted, and that he had received no response from his December 20, 2009, request, other than a wish to "be well soon." J.A. 252. The staff responded that Mr. Makdessi would be seen by a QMHP. *Id.*

10

Also on May 3, 2010, Mr. Makdessi submitted an Offender Request for Information to the prison mental health office, stating that he had been sexually assaulted at Wallens Ridge. J.A. 253. The staff responded that Mr. Makdessi was "seen in pod office on 5/6/10." *Id.*

In late July or early August 2010, Mr. Makdessi sent a letter to Gene M. Johnson, Director of the Virginia Department of Corrections, stating that he had been threatened and sexually assaulted on July 30, 2010. J.A. 256. The letter was stamped "RECEIVED" by the Department of Correction Inspector General on August 12, 2010. *Id.* In the letter, Mr. Makdessi stated that Inmate Julio Perez ordered him to perform oral sex. *Id.* However, on August 6, 2010, Mr. Makdessi signed a statement, which had been written for him by prison staff, stating, "Perez did not hit me, but I felt threatened and intimidated. The issue has been settled. I do not fear for my safety." J.A. 257, 531.

Two days after that, however, on August 8, 2010, Mr. Makdessi sent another letter to Gene M. Johnson describing the July 30 assault and stating, "I was made to drop the complaint out of 'fear' when I did not want to." J.A. 259-60. The letter stated that he had been sexually assaulted five times at WRSP, that his complaints had been

11

ripped up, and that "I was made to feel less of a human being by some C/Os & [a] few sergeants & two Lieutenants when I tried to report it." *Id.* He also stated he had been beaten by his cellmates. *Id.* Mr. Makdessi wrote that some correctional officers threatened him and called him "a snitch & bitch" and that he was "made to be known as a snitch by officers of this prison because of reporting the sexual assaults & having violated the '(code of silence)'." J.A. 260 (parentheses in original). Mr. Makdessi stated that he was "depressed & helpless" and that he "should be in a single cell because I cannot defend myself & and I get assaulted." *Id.* He concluded the letter by asking for someone to help him who would not "intimidate me" and "mak[e] me drop the sexual assault complaints." *Id.*

On October 6, 2010, Mr. Makdessi filed a complaint stating that he was suffering post-traumatic stress disorder "due to the sexual assaults." J.A. 261. QMHP Clark responded that Mr. Makdessi was assessed based on his claim of sexual assaults "that occurred prior to his transfer to WRSP," *id.*, even though Mr. Makdessi's complaints had repeatedly described sexual assaults that occurred at WRSP.

On October 27, 2010, Mr. Makdessi filed a grievance noting "all the sexual assaults" he had suffered and stating, "There has not been one inmate that I was placed in the cell with that did not assault me or sexually assaulted me or charged me commissary for protection & still assaulted when commissary ran out." J.A. 264. He further stated that "every time I report the assaults I get intimidated & made to drop the complaints & the cellmates/inmates are told I am a snitch & I get put in danger." *Id.* He added, "I want to do my time without torture." *Id.* The next day, the "Institutional Ombudsman/Grievance Coordinator" responded that the grievance contained insufficient information and interpreted it as a request for a single cell. J.A. 265.

Also on October 27, 2010, Mr. Makdessi submitted a grievance to the prison warden stating that security officers and mental health professionals at WRSP were trying to "cover up my past 4 years of reporting of sexual assaults & assaults & battery." J.A. 266. He attached to the grievance "three request forms that proves I reported sexual assaults that happened to me in this (WRSP) Wallens Ridge State Prison." *Id.* He noted that he had been attempting to report the sexual assaults for some time, but that staff had retaliated against him for do-

13

ing so. *Id.*

On October 28, 2010, Mr. Makdessi filed a complaint to the WRSP warden stating that he was suffering from "sexual assaults & assault & battery." J.A. 269. The warden apparently assigned the complaint to "Security," but that word is scratched out on the complaint and replaced with "QMHP." *Id.* Mr. Makdessi testified that he witnessed Lt. Fields scratch out "Security" and reassign the complaint when he met with Lt. Fields and Sgt. King to discuss the complaint. J.A. 553.

On October 28, 2010, Mr. Makdessi filed an Offender Request for Information to the prison mental health office stating, "I have reported to you many times that I was sexually assaulted at Wallens Ridge State Prison." J.A. 270. He also wrote that he was "sexually assaulted by my current cellmate," *id.*, though another version of the form does not contain that line, J.A. 271.[3] In any case, both versions of the form in the trial court record state that Mr. Makdessi had been sexually

---

[3] It was disputed at the evidentiary hearing whether Mr. Makdessi added the line "sexually assaulted by my current cellmate" after the form had been returned to him, or whether the line was on the original form but was whited out by prison officers. J.A 554-57, 943-44, 951-52.

assaulted at Wallens Ridge, that he was suffering from depression, and that he had been "ignored & denied" help. J.A. 270-71. The only staff response was that Mr. Makdessi had been assessed and "it has been determined that you do not have a mental health issue." *Id.*

On December 7, 2010, Mr. Makdessi filed a complaint stating that his cellmate taken 3,000 pages of Mr. Makdessi's legal documents, as well as stamps, pens and pads. J.A. 273. He wrote that he was filing the complaint so there was a record of it, but he knew that he may be "intimidated in[to] dropping this complaint just like the other complaints." *Id.*

On December 8, 2010, Mr. Makdessi filed a grievance stating that the WRSP staff had retaliated against him for filing grievances and complaints, and that he had suffered "sexual assaults & assault & battery." J.A. 274. Following up on this grievance on December 14, 2010, he sent an Offender Request for Information to the Offender Grievance office, asking about its status and again stating that he had been the victim of "sexual assaults & assaults & battery." J.A. 275. He also noted that over his four years in the prison, many of his grievances, legal mail and correspondence had been lost. *Id.* He resubmitted the

December 8th grievance several times, but still no one investigated his claims of sexual assault.  J.A. 563.

On December 20, 2010, one day before the assault and rape that precipitated this case, Mr. Makdessi sent a letter to Robert Moossy, Jr., Acting Section Chief at the FBI, stating that he was stabbed and sexually assaulted two weeks earlier, and that he told Lt. Fields that "my life is in danger and I need to be in P.C. but he did not do anything to help me and walked away."  J.A. 276.  He added, "Please help before I am killed."  *Id.*  In the letter to the FBI, Mr. Makdessi included in the envelope, in a separate package, his underwear from the sexual assault, stained with blood.  J.A. 567.  He also included a shirt that was bloodied in the stabbing.  *Id.*  Prison officials seized the package from Mr. Makdessi's cell and said they needed to maintain it as evidence.  J.A. 574-55.  John McQueen, a Department of Corrections institutional investigator, testified that prison officials lost the package between its seizure and the hearing in this case.  J.A. 678-80.

In addition to the written complaints and grievances, Mr. Makdessi on a number of occasions vocalized his fears of assault to prison staff.  He was repeatedly rebuffed in his attempts to report physical

16

and sexual assaults.  He testified that when he approached Sgt. King in the prison kitchen to inform him of an assault, Sgt. King said, "Get back to your table you effing bitch."  J.A. 525.  According to Mr. Makdessi, Lt. Fields told Mr. Makdessi that he was "sick and tired of me filing complaints" and "making allegations."  J.A. 527.

Mr. Makdessi met with Lt. Fields on December 20, 2010, to discuss Mr. Makdessi's complaint that his property, including his legal documents, were missing from his cell.  J.A. 571-72.  At that meeting, Mr. Makdessi told Lt. Fields that his life was in danger, that he wanted to be in protective custody, and that his cellmate was the leader of the gang in the pod.  J.A. 572.  Lt. Fields said that he would tell Sgt. King. *Id.*

### C.    The Assault on December 21, 2010

Around 9:20 a.m. on December 21, 2010, Michael Smith returned from a Department of Correctional Education class to the cell he shared with Mr. Makdessi at Wallens Ridge.  J.A. 854-55, 588,  Mr. Makdessi was lying on the bottom bunk of the bed, which he had been assigned because of his back problems.  J.A. 588.  Mr. Smith entered the cell and began punching and kicking Mr. Makdessi and calling him

a snitch. *Id.* Mr. Smith had a copy of a letter Mr. Makdessi had sent about two weeks earlier, notifying prison officials that Mr. Smith had assaulted and raped him on December 8, 2010. J.A. 589-90. Mr. Smith told Mr. Makdessi that he'd be killed before the day was over, and tore up the complaint letter — which he said had been provided to him by Sergeant King — and flushed it down the toilet. *Id.* Mr. Smith continued kicking and punching Mr. Makdessi, who was bleeding profusely, and the attack escalated to a sexual assault. J.A. 591-92. Mr. Smith held Mr. Makdessi down on the bunk and raped him. J.A. 592-93. Mr. Makdessi screamed and tried to fight back, but could not stop the assault. J.A. 593-94. Mr. Smith ejaculated onto the bed, and then continued to beat Mr. Makdessi. *Id.* He then ordered Mr. Makdessi to clean himself and put on fresh boxer shorts, and threw in the trash Mr. Makdessi's bloodied shorts. J.A. 594-95.

Mr. Makdessi testified that the fight was "very loud" and that "I was yelling for help, and I was screaming." J.A. 590-91. Another inmate in the pod, Curtis Leon Thomas, Jr., whose cell was next to Mr. Makdessi's, testified that he heard "an altercation between Eddie and his cellmate that morning." J.A. 698. He said the two were argu-

ing about "Eddie being a snitch," with Mr. Makdessi denying the claim. *Id.* "They was fighting and talking at the same time," Thomas testified. *Id.* He testified the fighting was loud enough that correctional officers in the pod should have been able to hear it. J.A. 699.

After the attack, Mr. Smith gathered several of Mr. Makdessi's personal items, including his television and holiday packet, and put them out in the hallway for other inmates to take. J.A. 596. When the cell doors were opened for inmates to pick up their lunch trays, Mr. Makdessi tried to escape, but Mr. Smith came at him and punched and beat him again, to keep him from escaping. J.A. 598. "[P]eople could hear me yelling for help," Mr. Makdessi testified, "but nobody came." J.A. 602. Finally, around 11:56 a.m., when the cell doors were opened again for inmates to put out their lunch trays and trash, Mr. Makdessi was able to run from the cell and into the pod. J.A. 603, 613. Mr. Smith ran after him out into the pod, and Mr. Smith along with another inmate, Flacco, a worker in the pod, caught up to Mr. Makdessi at the top of the pod stairs, and began hitting him. J.A. 603-05. Yet another inmate began coming toward them and yelled, "Throw him off the second tier." J.A. 604   A correctional officer then fired a blank round to

stop the attack, and Mr. Makdessi ran into a vestibule area to escape his attackers. J.A. 605.

At 10:56 a.m., according to a video recording of the pod from that morning, Officer Bellamy walked by Mr. Makdessi's cell while doing rounds. J.A. 820-21. Officer Bellamy testified that Mr. Makdessi called out to him, which was "quite out of the ordinary," and that he looked into the cell and saw nothing unusual. J.A. 814. Officers Boyd and Hall were also both on duty that morning in the building in which Mr. Makdessi was housed. J.A. 877-78, 887. Hall did rounds in the building that morning, and Boyd worked the control room. J.A. 878-79, 887. Boyd stated that he did not notice anything unusual until he saw Mr. Makdessi "burst out of the cell for the steps," and then saw Smith "had caught him, struck him on the head." J.A. 890.

Mr. Makdessi was taken to the infirmary for treatment, where Dr. Theodore Thompson was on duty. J.A. 617, 719. Dr. Thompson testified that "it was evident that he had been beaten up or assaulted." J.A. 719. Dr. Thompson found that Mr. Makdessi had multiple lacerations to his face, including around both eyes; multiple contusions, especially to his face; and bruising and contusions to his left rib area.

J.A. 719-21. He also had injuries around his nose. J.A. 734. Mr. Makdessi received two sutures for the laceration near his right eye, and three sutures for the laceration near his left eye. J.A. 722.

Mr. Makdessi then was taken to nearby Lonesome Pine Hospital for a Physical Evidence Recovery Kit ("PERK") test. J.A. 723. The test found blood but not sperm or seminal fluid inside Mr. Makdessi's rectum. J.A. 141, 729. The test also found blood on the inside back of his underpants. J.A. 141.

A Sexual Assault Assessment form, completed the evening of December 21, 2010, by QMHP K. David Jones, stated the following:

> The inmate states that he was assaulted today, 12-21-10, from about 9:30am to about 11:30am. The inmate says this assault happened in his cell, D142. Inmate Makdessi says that his cell-partner, Michael Smith … covered the cell door window and hit him, kicked him and 'raped me.' …
>
> The inmate has black eyes in both eyes, cuts and abrasions around his face. He reports being in pain and having problems breathing due to injuries to his ribs. He says that he has had thoughts of suicide, but can not kill himself due to his Christian faith, but wishes that someone else would kill him so he would not suffer anymore.
>
> …

> This is a weak inmate and is in danger of re-
> victimization.

J.A. 356-58.

### D. Department of Corrections Policy Requires Supervisors to Be Made Aware of Allegations of Sexual Assault

Virginia Department of Corrections policy, pursuant to the federal Prison Rape Elimination Act of 2003, Pub. L. No. 108-79, 117 Stat. 972, (codified at 42 U.S.C. § 15601 *et seq.*), requires that any prison staff member "who has reason to suspect that an offender has been the victim of sexual abuse or assault shall immediately report to his or her immediate supervisor or the officer in charge." Virginia Department of Corrections, Operating Procedure 038.3, *Sexually Abusive Behavior Prevention and Intervention*, § IV(C)(2)(a) (effective Feb. 15, 2010).[4] The policy also requires a supervisor, after receiving a report of sexual abuse, to (1) contact the Special Investigation Unit for an investigation to begin; (2) ensure that the victim is immediately escorted to the facility's medical unit; (3) ensure that the victim is transported to

---

[4] A copy of the policy can be found at Attachment A, pursuant to Fed. R. App. P. 28(f).

the local hospital for further treatment and counseling; (4) ensure that the victim is interviewed for protective custody needs; and (5) arrange follow-up medical treatment or mental health services. *Id.* § IV(C)(2)(e).

Defendant-Appellee Capt. Gallihar, who was responsible for the overall operations of the prison during the day shift, J.A. 901-02, testified that if an inmate makes an allegation of rape, he is taken to the medical office, sent out for a PERK test, and an investigation is begun, J.A. 905. If the rape allegation is made against the inmate's cellmate, the two are immediately separated. J.A. 905-06 . Capt. Gallihar also testified that, as a supervisor, he should be made aware of allegations of physical or sexual assault made by inmates under his control. J.A. 906, 917]. At the evidentiary hearing, the magistrate judge pressed Capt. Gallihar on this point:

> THE COURT: But if any of these officers had received a statement from the plaintiff saying "my cell mate has sexually assaulted me", would there not be some policy that required them to do something?

> THE WITNESS: Yes, they would report it immediately.

> THE COURT: And would that policy apply to any worker at the prison?

> THE WITNESS: Yes, it's reported to me, to the
> supervisor, at which point in time we separate
> the inmates and then the investigation will begin.

J.A. 920-21.  Capt. Gallihar also testified that if an inmate wrote a letter to an assistant warden, or someone of higher rank, about an officer under Capt. Gallihar's command, then he would be made aware of it. J.A. 498-99.  Capt. Gallihar testified that if an inmate alleges that he has been physically or sexually assaulted by his cellmate, or fears retaliation from correctional officers, then Capt. Gallihar would be notified. J.A. 499.

Lt. Fields stated that the security officers in the pods report to him, J.A. 768-69, and that "complaints are sent to me," J.A. 771.  He said that he "took over the building" in which Mr. Makdessi was housed, the D building, in January 2010, and acknowledged a question that described him as the "lieutenant in charge of the building."  J.A. 777, 792.  He said that prison procedure when an inmate states that he is in fear for his life is for the inmate to be separated from the other prisoners and placed in segregation.  J.A. 774.  Lt. Fields stated that the procedure for an inmate who says he was sexually assaulted by his cellmate is for the inmate and cellmate to be placed in segregation and

for the case to be referred to an investigator. J.A. 776. Lt. Fields further stated that if there was security issue in his pod, "then somebody would surely address it with me." J.A. 786. Sgt. King had supervisory authority, including over which inmates got jobs in the prison, J.A. 851, and he was in the control room around lunchtime on December 21, 2010, J.A. 834.

## SUMMARY OF ARGUMENT

The district court clearly erred in finding that the defendants were not deliberately indifferent to the risk of harm to Mr. Makdessi, given the overwhelming evidence of complaints and grievances Mr. Makdessi filed in the year leading up to the rape and assault at the center of this case and the loud, sustained nature of the assault. The trial record shows that between December 20, 2009, and December 20, 2010, Mr. Makdessi submitted 16 separate grievances, complaints, and letters stating that he had been sexually assaulted, several times mentioning assaults by cellmates. He repeatedly told prison officials he was in fear for his life because of attacks from his cellmate. In response to these complaints of physical and sexual assault, prison staff did nothing. In fact, they assigned him to share a cell with an inmate with a

history of violence, who had assaulted other inmates and officers and had acted sexually aggressive toward a prison staff member.

A prison official who is responsible for an inmate's safety and fails to prevent harm to the inmate violates the Eighth Amendment if (1) the inmate was "incarcerated under conditions posing a substantial risk of serious harm" and (2) the official's acts or omissions involved "deliberate indifference" to the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The magistrate judge found that the first prong of the test was met because Mr. Makdessi "clearly suffered serious physical injuries resulting from the assaults that occurred on December 21, 2010." J.A.964. The district court adopted this finding. J.A. 996-98.

Thus, the primary question on appeal is whether the defendant-appellees acted with deliberate indifference. Deliberate indifference has its own two-prong test, requiring that an official (1) had knowledge of a substantial risk of serious harm to an inmate; and (2) failed to respond adequately to that risk. *Farmer*, 511 U.S. at 837 "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *id.* at 842, and therefore the official "must have known about it," *id.* (citation and internal quotation marks

omitted); *see also Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770-72 (4th Cir. 2003) (holding prison officials liable for failing to prevent injury to an inmate when they knew about the risk of harm and did nothing to prevent it).

The totality of evidence in this case — including the litany of verbal and written complaints, the lengthy record of prison violence committed by Mr. Makdessi's cellmate, the strict state policy requiring the reporting of sexual assaults, and a loud, sustained attack on December 21, 2010 — makes it clear that the defendant-appellees knew of the serious risk to Mr. Makdessi's health and safety.  The magistrate judge stated, "I've heard all this evidence about how seriously everyone takes assaults, and sexual assaults, but yet … I have no evidence at all that there was any investigation at all of his claims."  J.A. 945.  She added, "[I]t just seems to me that there's no one at Wallens Ridge who either listened to this man or believed this man, anything he said."  J.A. 945-46.

In such circumstances, where officials are "aware of the risk of harm and simply ignore[] it," the officials are deliberately indifferent to a substantial risk of harm in violation of the inmate's Eight Amend-

ment right to be free of cruel and unusual punishment. *Odom*, 349 F.3d at 770-71; *see also Brown v. N.C. Dep't of Corr.,* 612 F.3d 720, 723 (4th Cir. 2010) (when prison officer is aware of an attack, a reasonable person can infer that "his failure to intervene represented deliberate indifference to a serious risk of harm").

## STANDARD OF REVIEW

Following a bench trial, this Court reviews findings of fact for clear error and legal conclusions *de novo*. *Helton v. AT & T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013). This Court "review[s] a district court's findings regarding whether a guard has acted with deliberate indifference under a clearly erroneous standard." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105-06 (4th Cir. 1995) (citations omitted); *see also Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011) ("When evidence is gathered by means of an evidentiary hearing conducted pursuant to 28 U.S.C. § 636(b)(1), the hearing before the magistrate judge is the equivalent of a bench trial, and we review the district court's findings of fact for clear error. Legal conclusions are reviewed *de novo*.") (citations and internal quotation marks omitted).

# ARGUMENT

Defendant-appellees exhibited deliberate indifference to the serious risk of harm facing Mr. Makdessi, and the district court erred in adopting the magistrate judge's Report and Recommendation and dismissing Mr. Makdessi's well-supported complaint.  The trial court record shows that the defendant-appellees both knew of the risk to Mr. Makdessi and failed to take appropriate steps to prevent it.   The Supreme Court has established that an Eighth Amendment failure-to-protect claim requires two showings: (1) "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834, and (2) "a prison official must have a sufficiently culpable state of mind," *Id.* (citation and internal quotation marks omitted).  The required state of mind is one of "deliberate indifference to inmate health or safety." *Id.* (citations and internal quotation marks omitted).

The magistrate judge found that Mr. Makdessi had satisfied the first prong of the test because he "clearly suffered physical injuries" from the December 21, 2010 attack.  J.A. 964.  The record contains substantial evidence of Mr. Makdessi's physical injuries, including QMHP

K. David Jones's report, dated the day of the assault, noting "black eyes in both eyes, cuts and abrasions around his face," J.A. 357, and the photographs of Mr. Makdessi showing facial injuries and bleeding, J.A. 293-99. This Court has held that "evidence of significant physical injury" is sufficient to survive summary judgment on the first *Farmer* element. *Odom*, 349 F.3d at 770. The district court properly adopted the magistrate's finding that Mr. Makdessi satisfied the first element. J.A. 996, 999. That leaves the deliberate indifference prong of the failure-to-protect test.

Deliberate indifference requires showing that an official (1) had knowledge of a substantial risk of serious harm to an inmate; and (2) failed to respond adequately to that risk. *Farmer*, 511 U.S. at 837 ("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."). Here, the record shows that the defendant officials had knowledge of the substantial risk to Mr. Makdessi and that they failed to adequately respond to it, constituting deliberate indifference. The district court's finding to the contrary is clear error.

30

## I.    The Defendants Must Have Known of the Substantial Risk of Serious Harm to Mr. Makdessi's Health and Safety

The voluminous evidence of complaints, grievances and other records documenting the threat to Mr. Makdessi and the sexual assaults he had suffered establish that the defendant-appellees knew of the substantial risk of serious harm to him.  The showing of knowledge of a substantial risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.  Further, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *id.*, and therefore the official "'must have known' about it," *id.* (citation and internal quotation marks omitted).

This Court has stated that a plaintiff can make a prima facie case under this deliberate indifference standard "by showing 'that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.'" *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Farmer*, 511 U.S. at 842) (brackets in original); *see also Rish v.*

31

*Johnson*, 131 F.3d 1092, 1099 (4th Cir. 1997) ("[W]e must determine . . . whether the risk was so obvious that it can be inferred that the prison officials knew of it.").

No direct evidence of an official's knowledge of the risk is necessary when a risk is obvious, and receiving complaints or being present at the time of an assault can make the risk obvious. This Court has held that a reasonable person could infer an officer's knowledge of the risk to an inmate from the fact that the officer was present at the time of an assault. *Brown*, 612 F.3d at 723 (holding that when officer is in the area of an assault, a reasonable person can infer that the officer "was aware of the attack, and that his failure to intervene represented deliberate indifference to a serious risk of harm"). This Court has approvingly cited other circuit courts' cases as authority on the established standard for deliberate indifference, *see Odom*, 349 F.3d at 773, and those cases have held that a jury can infer an official's knowledge of risk when he reviewed complaints, *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998), or when an inmate told the official about threats from his cellmate, *Haley v. Gross*, 86 F.3d 630, 642-43 (7th Cir. 1996).

The risk of harm to Mr. Makdessi and the assaults he suffered prior to the principal assault in this case were longstanding, pervasive, well-documented *and* expressly noted by prison officials. The record contains nearly 20 complaints, grievances and other written documentation submitted by Mr. Makdessi to prison officials in the year prior to the assault. Sixteen of the written submissions expressly mention "sexual assault." No investigation was undertaken. No steps were taken to separate Mr. Makdessi from his cellmate, who had a history of violence against prison officials and inmates. Despite Mr. Makdessi's repeated pleas for help, no help was forthcoming. In fact, after Mr. Makdessi had endured sexual assaults for years at the hands of prison inmates, WRSP officials assigned him in August 2010 to share a cell with a known predator.

As supervisors at Wallens Ridge with responsibility for the health and safety of inmates, Capt. Gallihar, Lt. Fields and Sgt. King, must have been aware that Mr. Makdessi had filed grievances, complaints and other reports noting his risk of attack and sexual assault. Capt. Gallihar, who oversaw prison operations, testified that allegations of sexual assault are "reported to me," J.A. 901-02, 921-22, and Lt.

33

Fields, as supervisor of the D Building at the prison, stated that "complaints are sent to me," J.A. 771. This is not a case where a lone complaint slipped through the cracks. This is a case of repeated complaints from a vulnerable inmate housed with a known predator, and the response from officials charged with protecting the health and safety of all inmates under their control was to look away. In *Spruce*, 149 F.3d at 786, where the plaintiff inmate "introduced numerous documents from the relevant time period containing references to the sexual attacks he was suffering," the Eighth Circuit held that a jury could conclude that the prison warden knew the inmate was at an excessive risk for sexual attack. Likewise, the Seventh Circuit held in *Haley*, 86 F.3d at 642-43, that an inmate's verbal warnings to prison officials that he was having problems with a cellmate, and the officials' failure to act, constitute deliberate indifference. *See also Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind [deliberate indifference] from the fact that the risk of harm is obvious.").

Here, the Wallens Ridge officials had both verbal and written complaints from Mr. Makdessi. They "must have known" of the risk posed to Mr. Makdessi by his cellmate. The district court, while ac-

34

knowledging that circumstantial evidence is sufficient to show deliberate indifference, nonetheless dismissed such evidence here because the complaints and grievances in which Mr. Makdessi stated that he was a victim of sexual assault also "often sought mental health treatment or a single cell assignment, rather than expressly requesting protection." J.A. 1006. But Department of Corrections policy does not differentiate between a sexual assault complaint that expressly requests protection and one that notes sexual assault in some other context. The policy does not require a sexual assault complaint to expressly request protection to be actionable by prison officials. Rather, the policy requires that staff must "immediately report to his or her immediate supervisor or the officer in charge" if they have "reason to suspect that an offender has been the victim of sexual abuse or assault." Virginia Department of Corrections, Operating Procedure 038.3, *Sexually Abusive Behavior Prevention and Intervention*, § IV(C)(2)(a) (effective Feb. 15, 2010). Further, "[a]n offender may report a sexual assault to any employee, including chaplains, medical, mental health or counseling staff, security staff or administrators, by informing the employee in any manner available," including verbally. *Id.* § IV(C)(1)(a).

Officers Bellamy, Boyd and Hall, who were on duty in Mr. Makdessi's pod the morning of the assault, must have heard Mr. Makdessi's screams and cries for help. The evidence in the record, including the testimony of Mr. Makdessi and a neighboring cellmate as well as the blood found in the cell and the significant injuries to Mr. Makdessi, clearly shows a lengthy attack, the sounds of which would have been audible to the officers on duty. This Court has found prison officials aware of a risk where officers could hear verbal threats to an inmate and did nothing to stop the impending attack. *Odom*, 349 F.3d at 771.

The Supreme Court has placed the burden on the prison officials to show that they did not know of an obvious risk. "[I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety." *Farmer*, 511 U.S. at 844. This Court has accepted the word of an officer that he or she was unaware of an obvious risk where some additional proof was offered. For instance, in *Rich v. Bruce*, 129 F.3d 336, 337 (4th Cir. 1997), the defendant officer escorted a handcuffed inmate through a corridor and past a door from which another inmate jumped out and attacked the handcuffed inmate with a shank. Not only did the officer testify that he was unaware of

36

the risk to the inmate, but the Court found that he had "exposed him-self, as well as [the inmate], to substantial danger through his actions." *Id.* at 340. The defendant's professed failure to realize the risk was supported by the fact that he put *himself* in danger.

This Court also declined to infer knowledge of risk when there was no evidence that the defendants had reviewed certain memo-randa addressed to them which stated that the plaintiff-inmate re-quired a wheelchair. *Shakka v. Smith*, 71 F.3d 162, 167, 167 n.5 (4th Cir. 1995). The inmate had been left in his cell without a wheelchair, and other inmates threw feces and urine on him. *Id.* at 165. However, the memoranda stating the inmate's medical condition had been sent to the defendants on the same day that he was assaulted, so it was rea-sonable to infer that the defendants had not had an opportunity to re-view them yet, and thus were not deliberately indifferent. *Id.* at 167 n.5.

The officers in the instant case have presented no additional evidence that they were unaware of the obvious risk to Mr. Makdessi's safety. Unlike in *Rich*, they never put themselves at risk. Unlike in *Shakka*, they began receiving grievances and complaints a full year in

37

advance of the assault and rape of Mr. Makdessi, not the day of the at-
tack. When "the circumstances suggest that the defendant-official be-
ing sued had been exposed to information concerning the risk and thus
must have known about it," a finding of deliberate indifference can be
made. *Parrish*, 372 F.3d at 303. Here, because the defendant officers
have made no compelling showing that they lacked knowledge of the
risk to Mr. Makdessi, and because the risk was obvious based on the ex-
tensive record of complaints and grievances, this Court should find that
the officials had knowledge of the risk.

## II.    The Defendants Failed to Respond Adequately to the Known Risk to Mr. Makdessi

Under the second prong of the *Farmer* test, for an official's
conduct to qualify as deliberate indifference, he or she must "disre-
gard[]" the known risk. *Farmer*, 511 U.S. at 837. This Court has held
that failing to respond at all to a known risk constitutes deliberate in-
difference, unless it was not feasible to respond. *Odom*, 349 F.3d at
773-74 (doing nothing in response to inmate requests violates inmate's
Eighth Amendment rights). In *Odom*, this Court held that "a prison of-
ficial acts with deliberate indifference when he ignores repeated re-
quests from a vulnerable inmate to be separated from a fellow inmate

who has issued violent threats which the aggressor will likely carry out in the absence of official intervention." *Id.* at 773. *See also Rodriguez v. Sec. for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) ("A prison official violates the Eighth Amendment when he actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner.") (footnote omitted). Likewise, when officials are aware of a serious medical need and yet choose to do nothing, they violate the Eighth Amendment. *Iko v. Shreve*, 535 F.3d 225, 241-43 (4th Cir. 2008).

The defendant-appellees did nothing to prevent the rape and assault on Mr. Makdessi that occurred on the morning of December 21, 2010. They did not act on his numerous reports of sexual assault. They did not separate him from a younger, stronger cellmate with a history of prison violence, who had physically and sexually attacked others in the prison. In fact, prison officials assigned Mr. Makdessi to share a cell with his assailant, despite Mr. Makdessi's history as a victim of sexual assault and Smith's history as an aggressor. The defendant-appellees did not respond to Mr. Makdessi's pleas for help. Their only response

came when it was too late, when Mr. Makdessi took advantage of the opening of the cell doors to run into the pod, after he had already been raped and seriously injured. The harm was already done.

## CONCLUSION

The risk of harm to Mr. Makdessi was longstanding, pervasive and well-documented, and the record of grievances and complaints was so extensive that officials must have known of the risk he faced. They also must have heard his screams and cries for help the morning of the attack. But they did nothing. Under the cases of the Supreme Court and this Court, their inaction constitutes deliberate indifference. *See Farmer*, 511 U.S. at 842-43; *Parrish*, 372 F.3d at 303.

Because the district court clearly erred in adopting the Report and Recommendation of the magistrate judge and finding for the defendant-appellees on Mr. Makdessi's claim of an Eighth Amendment violation, the judgment of the district court should be reversed.

Respectfully submitted,


/s/_____
Daniel Suleiman
Stephen Kiehl
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW
Washington, DC 20004–2401
(202) 662–6000

*Counsel for Plaintiff-Appellant*
*Adib Eddie Ramez Makdessi*

June 9, 2014

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The Plaintiff-Appellant respectfully requests oral argument in this case because it concerns an important issue of public interest regarding the proof necessary for a finding of deliberate indifference on the part of a prison official. The extensive record developed by the trial court presents this Court with an opportunity to clarify the circumstances in which it is obvious that a prison official must have known of a risk of substantial harm to an inmate.

Moreover, this case deals with sexual assault in prison, an area in which Congress has recently passed legislation, *see* Prison Rape Elimination Act of 2003, Pub. L. No. 108-79, 117 Stat. 972, *codified at* 42 U.S.C. § 15601 *et seq.*, in which it found that "[m]ost prison staff are not adequately trained or prepared to prevent, report, or treat inmate sexual assaults," an issue central to the instant case.

Finally, due to the complexity of the record and legal issues in this case, oral argument would aid the decisional process.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____          Caption: _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

> [ ]      this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

> [ ]      this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [ ]      this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

> [ ]      this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2014, I caused copies of the Opening Brief for Plaintiff-Appellant Adib Eddie Ramez Makdessi to be served by the Court's Electronic Case Filing system upon:

Trevor S. Cox
Richard C. Vorhis
Kate E. Dwyre
Office of the Attorney General
900 East Main Street
Richmond, VA 23219


_____/s/_____
Stephen Kiehl

**ATTACHMENT A**

| | | Effective Date | Number |
|---|---|---|---|
| | | February 15, 2010 | 038.3 |
| **Virginia Department of Corrections** | | Amended | Operating Level |
| | | | Division |
| **Operating Procedure** | | Supersedes | |
| | | First Issue | |
| | | Authority | |
| | | COV §18.2-64.2, §18.2-61 | |
| | | Prison Rape Elimination Act (Public Law No. 108-79) | |
| Subject | | ACA Standards | |
| **SEXUALLY ABUSIVE BEHAVIOR PREVENTION AND INTERVENTION** | | ACA 4-4281-1, 4-4281-2, 4-4281-3, 4-4281-4, 4-4281-5, 4-4281-6, 4-4281-7, 4-4281-8, 4-4406 | |
| Incarcerated Offender Access  Yes ☒  No ☐ | FOIA Exempt Yes ☐     No ☒ Attachments  Yes ☒ # 3   No ☐ | Office of Primary Responsibility Deputy Director of Operations Deputy Director of Community Corrections | |

## I. PURPOSE

The Prison Rape Elimination Act of 2003 (Public Law No. 108-79) (PREA) was signed into law in 2003 to "provide for the analysis of the incidence and effects of prison rape in Federal, State, and local institutions and to provide information, resources, recommendations, and funding to protect individuals from prison rape." Meeting the objectives of PREA is a priority of the Virginia Department of Corrections (DOC). DOC has zero tolerance for offender-on-offender sexual assault or abuse, or sexual misconduct or harassment towards offenders. This agency strives to provide a safe environment where offenders are free from such assault and sexual misconduct, and makes every effort to detect, prevent, reduce, and punish sexual abuse, assault, harassment, and misconduct.

This operating procedure provides PREA related information for the DOC, and will serve to direct staff to specific PREA related content in other DOC operating procedures.

## II. COMPLIANCE

This operating procedure applies to all offenders, DOC employees, contractors, volunteers and all persons who conduct business with the Virginia Department of Corrections. Sexual conduct between offenders; or employees, volunteers, contract personnel, or visitors and offenders, regardless of consensual status, is prohibited by Code of Virginia §18.2-64.2, §18.2-67.4. ACA Standard 4-4281-6 and Operating Procedures 130.1 *Rules of Conduct Governing Employees Relationships With Offenders*, 135.1 *Standards of Conduct*, 861.1 *Offender Discipline, Division of Operations* and 861.2 *Offender Discipline, Community Corrections Facilities* shall also apply.

## III. DEFINITIONS

**Abuse -** The improper use or treatment of an individual that directly or indirectly affects an individual negatively. Any intentional act that causes physical, mental, or emotional injury to an individual.

**Carnal Knowledge -** The acts of sexual intercourse, cunnilingus, fellatio, anallingus, anal intercourse, and animate and inanimate object sexual penetration. *(Code of Virginia §18.2-64.2)*

**Fraternization -** The act of, or giving the appearance of, association with offenders, or their family members, that extends to unacceptable, unprofessional and prohibited behavior. Examples include excessive time and attention given to one offender over others, non-work related visits between offenders and employees, non-work related relationships with family members of offenders, spending time discussing employee personal matters (marriage, children, work, etc.) with offenders, and engaging in romantic or sexual relationships with offenders. (*see* Operating Procedure 130.1 *Rules of Conduct Governing Employees Relationships with Offenders*)

**Medical Authority -** The facility medical authority is the facility physician. The Chief Physician provides clinical supervision for the facility physician.

**Offender -** An inmate, probationer, parolee or post release supervisee or other person placed under the supervision or investigation of the Department of Corrections.

**Offender-on-Offender Sexual Abuse/Assault -** When one or more offenders engage in sexual conduct or contact with another offender against his or her will or by use of threats, intimidation or other coercive actions. Offender-on-offender sexual abuse is a form of "prison rape" under the *Prison Rape Elimination Act of 2003, 42 U.S.C. §15609.*

**Qualified Mental Health Professional (QMHP) -** An individual employed in a designated mental health services position as a Psychologist or Psychology Associate, Psychiatrist, Social Worker (masters level) or Registered Nurse or an individual with social work or relevant human services field with knowledge, training, and skills in the diagnosis and treatment of mental disorders.

**PERK -** *Physical Evidence Recovery Kit* administered by specially trained professional medical practitioners to collect forensic evidence for criminal investigations of sexual assaults and other sexual violations. PERK examinations should be administered within seventy-two (72) hours of an alleged incident of sexual intercourse.

**Rape -** *Prison Rape Elimination Act of 2003, 42 U.S.C. §15609* defines rape as "the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person, forcibly or against that person's will; or not forcibly or against the person's will, where the victim is incapable of giving consent because of his or her youth, or his or her temporary or permanent mental or physical incapacity; or ...the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person achieved through the exploitation of the fear or threat of physical violence or bodily injury."
Code of Virginia §18.2-61 defines rape as any person who has "sexual intercourse with a complaining witness, whether or not his or her spouse, or causes a complaining witness, whether or not his or her spouse, to engage in sexual intercourse with any other person and such act is accomplished (i) against the complaining witness's will, by force, threat or intimidation of or against the complaining witness or another person; or (ii) through the use of the complaining witness's mental incapacity or physical helplessness; or (iii) with a child under age 13 as the victim, he or she shall be guilty of rape."

**Sexual Abuse -** Subjecting another person to any sexual act or contact between an employee, volunteer or agency representative and an offender by force, persuasion, inducement, or enticement; any sexual act or contact in which an employee, volunteer or agency representative participates or forces any offender to engage; subjecting another person who is incapable of giving consent by reason of their custodial status, physical state or mental state; or rape, sexual molestation, prostitution or other form of sexual exploitation.

**Sexual Assault -** Any sexual touching or contact that is non-consensual forced or coerced in any manner, including but not limited to rape, sodomy, or unlawful touching. (*see* Code of Virginia §18.2-67.10)

**Sexual Assault Hotline -** A toll free telephone number maintained by the Office of the Inspector General to allow offenders to report sexual abuse or misconduct by dialing #55 from any offender telephone system phone.

**Sexual Assault/Abuse, employee-on-offender -** When an employee, volunteer, intern or contractor engages in sexual conduct, including sexual contact, with an offender. Employee-on-offender sexual abuse is a form of "prison rape" under the *Prison Rape Elimination Act of 2003, 42 U.S.C. §15609.* Code of Virginia §18.2-64.2, 18.2-67.4. Intentional physical contact or touching by an employee, volunteer, intern or contractor, of intimate parts of an offender in a sexual manner, consensually or non-consensually, shall be deemed Sexual Battery (*see* Code of Virginia §18.2-67.4). This definition does not include incidental touching during security searches.

**Sexual Assault with an Object** - The use of any hand, finger, or other instrument or object to penetrate, however slightly, the genital or anal opening of the body of another person. This does not apply to medical personnel engaged in evidence gathering or legitimate medical treatment, or to health care personnel performing body cavity searches in order to maintain security and safety within a facility.

**Sexual Harassment** - Unwelcome sexual advances; sexually offensive language, comments or gestures; influencing, promising or threatening an offender's safety, custody, privacy, housing, privileges, work or program status, in exchange for personal gain or favor of a sexual nature; creating or encouraging an atmosphere of intimidation, hostility or offensiveness as perceived by any individual who observes the sexually offensive behavior or language.

**Sexual Misconduct** - Any behavior or act of a sexual nature directed toward an offender by an employee, volunteer, visitor or agency representative. This includes but is not limited to acts or attempts to commit such acts of sexual assault, sexual abuse, sexual harassment, sexual contact, conduct of a sexual nature or implication, obscenity, and unreasonable invasion of privacy. Sexual misconduct also includes but is not limited to conversations or correspondence that suggests a sexual relationship between an offender and any party mentioned above.

**Special Agent** - Office of Inspector General criminal investigator assigned to the Special Investigations Unit (SIU)

IV.    **PROCEDURES**

A.  Zero Tolerance Policy

   1.   DOC prohibits and will not tolerate any fraternization or sexual misconduct between staff, contractors, volunteers and offenders, or between offenders as defined in Section III of this operating procedure. The Department actively works to prevent, detect, report and respond to any violation.

   2.   Any behavior of a sexual nature between employees and offenders is prohibited. Employees are subject to a Group III offense under Operating Procedure 135.1 *Standards of Conduct*, and may be prosecuted under the Code of Virginia. All staff, contractors and volunteers are required to report any suspicion of fraternization or sexual behavior between staff, contractors, volunteers and offenders. Staff are not only required to report, but also may be subjected to a Group action if they do not.

   3.   Any behavior of a sexual nature by incarcerated offenders is prohibited and subject to disciplinary action per Operating Procedure 861.1 *Offender Discipline, Division of Operations* and *861.2 Offender Discipline, Community Corrections Facilities*, and may result in other criminal charges.

   4.   Consensual sexual activity among offenders will not be permitted. If offenders engage in this type of activity one or both offenders will be dealt with in accordance with Operating Procedure 861.1 *Offender Discipline, Division of Operations* and Operating Procedure 861.2 *Offender Discipline, Community Corrections Facilities*.

B.  Prevention

   1.   Offender Training

      a.   When an offender enters a DOC facility from a jail, primarily at Reception Centers or Jail Intake sites, the offender shall receive instruction on how to prevent and report sexual assaults and prison rape. This information shall be communicated verbally and in writing, in language clearly understood by the offender (4-4281-1). At a minimum the offender shall receive the pamphlet immediately upon intake and the training within 10 days of arrival.

      i. *Preventing Sexual Abuse and Sexual Assault Training (see Attachment #3)* including use of the video "Speaking UP: Discussion Prison Sexual Assault"

      ii. DOC pamphlet *Sexual Assault Awareness and Prevention (see Attachment #1)* that includes the Sexual Assault Hotline number.

         The offender shall sign acknowledgement of receiving the information via documentation *(see Attachment #2 English) (see Attachment #2 Spanish)* and documentation should be placed in the offender's record.
It is mandatory that offenders attend the training. Offenders refusing shall be charged with Offense 200, per Operating Procedure 861.1 *Offender Discipline, Division of Operations*.

      iii. Facilities shall make arrangements for offenders that speak languages other than English or Spanish, and with offenders with disabilities, to receive training and materials in a language understood by the offender.

  b. When a new offender is received from another DOC facility via transfer, staff shall check the offender's Institutional Criminal Record for documentation that he or she has previously completed all PREA training. If documentation is found, the offender shall be provided the PREA pamphlet with the Sexual Assault Hotline number, however the offender does not need the entire PREA training again. If documentation is not found, the offender shall be provided the entire PREA training as described in Section IV.B.1.a. of this operating procedure.

  c. Information shall include the following topics:

      i. Definition of sexual misconduct/assault, and behaviors prohibited by staff, contractors, volunteers and offenders

      ii. Prevention

      iii. Self-protection

      iv. Reporting sexual abuse/assault

      v. Treatment and counseling

      vi. Inmate telephone sexual abuse Hotline Number #55

2. Employee and Volunteer Training

  a. All DOC employees, contractors, and volunteers who regularly enter facilities shall receive instruction related to the prevention, detection, response, reporting, investigation, and sanctions related to sexual assault/abuse/misconduct/harassment. These individuals shall be required to pass an exam. Training will be provided at the following venues:

      i. New employee orientation

      ii. Basic Skills Training for each discipline

      iii. Annual In-Service

  b. Employees shall be responsible for understanding and preventing sexually abusive behavior through training, awareness of environment, detection of incidents of sexual abuse or behavior that may lead to abuse, and being amenable to offender reporting. (*see* Operating Procedure 130.1 *Rules of Conduct Governing Employees Relationships with Offenders*)

  c. Employees shall be responsible for knowing indicators of inappropriate relationships and prevention strategies listed in the DOC Fraternization Awareness and Prevention Brochure. (*see* Operating Procedure 130.1 *Rules of Conduct Governing Employees Relationships with Offenders*)

d. Violations of Operating Procedure 130.1 *Rules of Conduct Governing Employees Relationships with Offenders* will result in disciplinary action outlined in Operating Procedure 135.1 *Standards of Conduct* and possible criminal prosecution.

e. Employees shall be aware of methods to encourage offenders to report sexual assault/abuse as specified by Operating Procedure 130.1 *Rules of Conduct Governing Employees Relationships with Offenders*.

3. Offender Screening

   a. Employee/contractor/volunteer screening and a criminal history record investigation (e.g. VCIN) will be conducted on prospective employees, volunteers and contractors to ensure against the hiring of any person who may have a history of perpetrating sexual assault, abuse, misconduct or harassment.

   b. Within 24 hours after admission into the Department of Corrections, offenders will be screened for potential vulnerability to sexual assault, or tendencies to act out with sexually aggressive behavior (4-4281-2*)*. Reception Units will assess all incoming offenders for double cell assignments.

      i. Offenders determined to be at risk for assignment to a double cell will be identified. This information will be documented on the Alert Reference Card (see Operating Procedure 050.1, *Incarcerated Offender Records Management*). Assessment will include the following factors:

         ▪ history of assaultive behavior,

         ▪ potential for victimization,

         ▪ history of prior victimization,

         ▪ special medical or mental health status, age, disabilities and

         ▪ any other pertinent information.

         ▪ procedures required by Directive 425 *Incarcerated Offender Housing and Work Assignments* are specified in Local Operating Procedure 425.5 *Facility Bed and Cell Assignments*.

      ii. Offender screening shall determine if a special housing assignment or transfer to another facility is necessary (4-4281-2) (*see* Operating Procedure 861.3 *Special Housing* and Operating Procedure 830.5 *Transfers, Facility Reassignments*)*. The following factors will be considered:

         ▪offenders at risk of being a sexual abuse victim, or

         ▪offenders exhibiting sexually aggressive behavior;, or

         ▪if a sexual abuse or assault allegation has been made.

      iii. Assignments to double cells shall consider the compatibility of both cell mates (see Directive 425*, Incarcerated Offender Housing and Work Assignments). Crucial information shall be documented on the Alert Reference Card (see Operating Procedure 050.1, *Incarcerated Offender Records Management*)

      iv. Offenders with a history of sexually assaultive behavior shall be identified, monitored and counseled (4-4281-4). Those who are identified as being at high risk for future behavior shall be assessed by a Qualified Mental Health Professional or other qualified professional. Counseling on adjustment issues may be provided by a case management counselor. Counseling on mental health issues shall be provided by a QMHP.

     v. Offenders identified as being at risk for sexual victimization shall be identified and assessed by a mental health or other qualified professional. Those who are determined to be at risk for sexual victimization shall be monitored and counseled (4-4281-5).

4. Security and Operational Practices

    a. Sexually abusive behavior occurs along a continuum of graduated degrees from situations that create risk to an actual offense. Appropriate security and operational practices to minimize risks will help to reduce the opportunity for sexual abuse.

    b. Security and operational practices exist to eliminate or reduce situations that create risk for any security breaches, including preventing sexually abusive behavior. These are accepted correctional practices and are routinely carried out as DOC is capable, within available resources and existing facility designs. Individual employees have a duty for heightened awareness of situations that present risk and should be vigilant in the prevention and detection of sexual abuse in the performance of normal duties. Practices staff should be aware of that help prevent risk include, but are not limited to:

      i. facility physical plant design and equipment that deter and detect security breaches, such as cameras, recorders, sign-in-logs, centrally placed control rooms and posts, frequent site supervision

      ii. preventing gang activity

      iii. eliminating drugs, weapons, and other contraband,

      iv. eliminating blind areas where supervision is difficult

      v. conducting random and frequent cell checks

      vi. maintaining open communication with, and high observation of offenders

      vii. regular inspections of offender living, work, and activity areas

C. Detection and Reporting

1. Offender Responsibilities

    a. Offenders shall have the opportunity to report sexual assaults to any employee, and will not be required to report only to the immediate point-of-contact line officer (4-4281-7). An offender may report a sexual assault to any employee, including chaplains, medical, mental health or counseling staff, security staff or administrators, by informing the employee in any manner available, e.g. verbally, through the inmate telephone system Sexual Assault Hotline Number #55, or in writing as indicated in Operating Procedure 861.1 *Offender Discipline, Division of Operations.*

    b. An offender who is sexually assaulted shall immediately notify staff that a sexual assault has occurred.

    c. Offenders who observe, are involved in, or have any knowledge or suspicion of a sexual assault or unauthorized relationship shall immediately notify staff.

    d. An offender who makes a report of offender-on-offender sexual violence or employee sexual misconduct/harassment that is determined to be false, may be charged with a *Category II offense - Lying or giving false information* and is subject to the appropriate disciplinary action. (*see* Operating Procedure 861.1 *Offender Discipline, Division of Operations; or* Operating Procedure 861.2 *Offender Discipline, Community Corrections Facilities*)

2. Staff Responsibilities

a.  Any employee, volunteer, or contractor who has reason to suspect that an offender has been the victim of sexual abuse or assault shall immediately report to his or her immediate supervisor or the officer in charge.  If applicable, an incident report shall be submitted in compliance with Operating Procedure 038.1 *Incident Reporting.*

b.  Employees, volunteers and contractors shall report to the supervisor, Organizational Unit Head or officer in charge any suspicion or knowledge of other staff, volunteer or contractor fraternization with offenders. (*see* Operating Procedure 130.1 *Rules of Conduct Governing Employees Relationships With Offenders*

c.  When an offender reports physical sexual assault or abuse, the supervisor, officer in charge or Unit Head shall:

    i.   ensure the victim's safety

    ii.  attempts should be made to preserve any evidence such as discouraging the victim from showering, eating, brushing teeth, or drinking until after evidence collection

    iii. ensure the victim is escorted to the facility medical unit as soon as possible to provide appropriate treatment per Local Operating Procedure 720.7 *Emergency Care* (see Directive 720 and Implementation Memorandum)

d.  The individual in charge at the scene of an alleged sexual assault shall take appropriate action necessary to preserve the physical and testimonial evidence until it is released to the responding Special Investigator.

e.  Supervisor Responsibility after Receiving Report of Abuse

    i.   The Organizational Unit Head or Administrative Duty Officer shall immediately initiate necessary action, or verify that action has been taken, to protect all physical evidence and the safety and welfare of the offender.  The Organizational Unit Head or Administrative Duty Officer may make a temporary administrative reassignment of the victim and/or perpetrator to protect the offender or offenders involved.  An investigation shall be conducted and documented (4-4281-3).

    ii.  The supervisor or their designee will immediately question the victim to determine the suspect or suspects; where and when the sexual assault occurred; and if facts warrant further investigation.  The supervisor shall also:

        •  contact the Special Investigation Unit. *(see Directive 030 Inspector General* and Operating Procedure 030.4 *Special Investigations Unit.*  An investigator will ensure protocol is followed to investigate the sexual abuse, misconduct or assault.

        •  ensure that the victim is immediately escorted to the facility's medical unit area for examination, treatment and evaluation per Local Operating Procedure 720.7 *Emergency Care* (see Directive 720 *Health Care Services* and Implementation Memorandum)

        •  ensure the victim is transported to the local hospital for further treatment, examination, documentation, collection of forensic evidence, testing for sexually transmitted diseases, and referral for counseling if warranted.

        •  ensure that upon return from the hospital emergency room, the victim is interviewed for protective custody needs.

        •  ensure follow up medical treatment or mental health service needs are arranged.

      iii. If the alleged perpetrator is an employee, he or she shall be reassigned to a post with no offender contact, suspended, or placed on pre-disciplinary leave with pay based on circumstance or situation, pending completion of the investigation as outlined in Operating Procedure 130.1 *Rules of Conduct Governing Employees Relationships With Offenders*

    f. All case records associated with claims of sexual abuse, including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings and recommendation for post-release treatment or counseling shall be retained and disposed of in accordance the Records Retention and Disposition Schedule No. 701-100 for all correctional facilities (4-4281-8).

D. Health Services Responsibility - Health Services staff shall:

    a. Report and document all allegations of sexual abuse/assault or threats of sexual abuse or assault to the Organizational Unit Head or Administrative Duty Officer immediately.

    b. Conduct an evaluation to determine the alleged victim's need for immediate medical treatment, taking precautions not to destroy potential evidence. If necessary, refer the offender to a Qualified Mental Health Professional (QMHP) or to a community medical facility, and direct hospital staff to conduct an initial mental health assessment (4-4406)

    c. Follow procedures specified in the Medical and Nursing Guideline for Sexual Assaults including transport to a local emergency room for verification of the incident (rape kit recommended) and initial treatment. If the offender alleging assault refuses to be examined, it shall be documented in the progress notes and the offender shall sign a refusal of treatment form.

    d. Document in the medical record all communications with the victim, as well as all actions taken. Maintain complete and accurate treatment documentation for any sexual abuse or assault incidents.

    e. Ensure that pre- and post-HIV and STD counseling has been completed.

    f. Ensure that the emergency room report and follow-up recommendations are reviewed by the facility's Medical Authority.

    g. Ensure that follow-up orders are relayed to any receiving facility.

    h. Provide continuity of care to the alleged victim upon his or her return to the DOC facility.

E. Mental Health Responsibility – Qualified Mental Health Professionals shall:

    a. Conduct an assessment of an offender who has been or who alleges to have been a victim of sexual assault, and based on the assessment to provide additional mental health services as specified in Operating Procedure 730.3 *Mental Health Services: Levels of Service*.

    b. Follow DOC confidentiality practices as specified in Operating Procedure 730.6 *Mental Health Services: Confidentiality*

    c. For process of reporting and investigation follow Operating Procedure 038.2 *Reporting & Investigation of Alleged Abuse or Assault Against Aged or Incapacitated Offenders*

    d. Maintain complete and accurate treatment documentation for any sexual abuse or assault incidents as per Operating Procedure 730.1, *Mental Health Services: Administration*.

    e. When the alleged sexual abuse involves an aged or incapacitated offender victim as defined in Operating Procedure 038.2 *Reporting and Investigation of Alleged Abuse or Assault Against Aged or Incapacitated Offenders*, refer to that operating procedure for additional guidance.

F.  Special Investigations

1.  The Special Investigations Unit (SIU) shall conduct investigations into criminal behavior, procedural or administrative violations, or employee misconduct affecting the operations of the Department.   The Chief of the Special Investigation Unit or a designee shall review the nature of the allegations received to determine if an investigation is warranted. *(see* Directive 030 *Inspector General )*

2.  Upon notification of an allegation of sexual abuse or misconduct, investigative staff should follow procedures outlined in Directive 030 *Inspector General* and Operating Procedure 030.4 *Special Investigations Unit.*

3.  The Special Investigator shall ensure that all evidence collected at the facility and at the hospital (PERK test, evidence collection, etc.) is handled in accordance with Operating Procedure 445.2 *Facility Searches and Inspections*

4.  Documentation and recording of investigations shall occur according to Operating Procedure 030.4 *Special Investigations Unit.*

G.  Management of Sexual Aggressors

1.  When an offender is identified as a sexual aggressor, the offender shall meet with a mental health counselor quarterly to assess his or her propensity for predatory or aggressive behavior.   This information shall be documented in their health records.

2.  An offender's designation as a sexual aggressor will be documented on the Alert Reference Card in the offenders Institutional Criminal Record (ICR) per Operating Procedure 050.1 *Incarcerated Offender Records Management.*

3.  This identification for sexual aggressive behavior shall be changed when circumstances change per Local Operating Procedure 425.4 (See Directive 425 *Incarcerated Offender Housing and Work Assignments* and Implementation Memorandum)

4.  An aggressor legally convicted of a sexual assault while incarcerated will be considered a sex offender by statute and subject to the requirement of the Sex Offender Registry.

5.  Offenders who are convicted of sexual assault should be given the opportunity to participate in all sex offender treatment programs offered by the Department, consistent with resource availability and facility security considerations.

H.  Data Collection

Upon request for information, the DOC Office of the Director will designate an organizational unit responsible to respond to external surveys or audits required by the PREA legislation.

XII.  REFERENCES

Directive 030 *Inspector  General*

Operating Procedure 030.4 *Special Investigations Unit*

Operating Procedure 038.1 *Incident Reporting*

Operating Procedure 038.2 *Reporting and Investigation of Alleged Abuse or Assault Against Aged or Incapacitated Offenders*

Operating Procedure 050.1 *Incarcerated Offender Records Management*

Operating Procedure  130.1 *Rules of Conduct Governing Employees Relationships w/Offenders*

Operating Procedure 135.1 *Standards of Conduct*

Operating Procedure 425.4 *Facility Bed and Cell Assignments* (FOIA Exempt)

Operating Procedure 445.2 *Facility Searches and Inspections* (FOIA Exempt)

Operating Procedure 720.7 *Emergency Care (*Local –see Directive 720)

Operating Procedure 730.3 *Mental Health Service: Levels of Services*

Operating Procedure 730.6 *Mental Health Services: Confidentiality*

Operating Procedure 830.1 *Facility Classification Management*

Operating Procedure 830.2 *Security Level Classification*

Operating Procedure 830.5 *Transfers, Facility Reassignments*

Operating Procedure 861.1 *Offender Discipline, Division of Operations*

Operating Procedure 861.2 *Offender Discipline, Community Corrections Facilities*

Operating Procedure 861.3 *Special Housing*

Operating Procedure 864.1 *Offender Grooming and Hygiene*.

Department of State Police Sex Offender Registry

XIII. REVIEW

This operating procedure shall be reviewed annually by the Deputy Director of Operations and the Deputy Director of Community Corrections and rewritten no later than February 15, 2013.

**Signature Copy on File**
_____
John Jabe
Deputy Director of Operations

**Signature Copy on File**
_____
James Camache
Deputy Director of Community Corrections